May it please the court. I am Larry Rosen. I represent appellants Mr. Eckert and Mr. Bell, investors in PayPal stock. On November 10, 2017, PayPal issued a press release falsely stating they had discovered a vulnerability in certain security issues with Teal's network that didn't meet PayPal's standards. And as a result, Teal was suspending operations pending investigation. Now, PayPal had no obligation to speak on November 10 and say anything. But once they spoke about that incident and their decision to shut down Teal, they were obligated to tell the truth. Now, the harm from an actual breach of Teal's network is much greater than a mere vulnerability. Here, witnesses said that on November 10, PayPal had found a hacker had breached the system of a customer's personal data. One specifically named said that Coons personally told him that there had been a breach of the network that had imperiled customer data. Now, You said there was one person who hacked in. Yes, there was. Well, there was an intruder. Yes, one person hacked in. There was one person who had access to customer data on the network. Now, Defendants claimed that they didn't disclose the breach on November 10 because the precise damage was unknown at that time, and they wanted to complete an investigation to determine exactly the extent of the damage the hacker had done. But as far as they knew, as of November 10, all the customer information was potentially compromised, because once the hacker is in the system, there's a risk that it's all potentially exposed to danger. To compromise something is to expose it to danger. And they used the term potentially compromised in their press release. And as of November 10, it was all potentially compromised until they could complete their investigation and figure out exactly how bad the damage was. An analogy is, you know, there's a fox was in the hen house and had eaten an unknown number of hens. Instead, they lied and said they had discovered the hen house door had a faulty lock and in their process of fixing it. Right? If the fox is in the hen house, all the hens are potentially compromised until you go in and count the damage. And so they were obligated to adequately inform investors of the risk from the breach that potentially compromised an undetermined number of customers. And the lower court found that the complaint adequately pled that the statement that they had only discovered a vulnerability was misleading, because a vulnerability is very different than a breach. A breach is much more serious and potentially damaging. The crux of the lower court's error is that it combines scienter and loss causation. It based its scienter analysis on an erroneous view of the requirements for loss causation. It created, in essence, it created a new and improper standard for scienter. And it compounded that error by using the wrong legal standard for loss causation. The court reasoned that unless a plaintiff's alleged PayPal had knowledge on November 10 that precisely 1.6 million customers' data had been compromised, they would be unable to allege loss causation. And therefore, in assessing scienter, the court required allegations that PayPal or Mr. Kunz knew November 10th the precise extent of the damage done by the hacker. Now, in the Ninth Circuit, complaint need only allege that the misrepresented facts were a substantial factor, not the sole factor, right? So that's much different than the standard that the court applied for loss causation. Moreover, the court's false statement was that PayPal had discovered a vulnerability. Excuse me, the district court ruled on loss causation? Well, it based its scienter analysis. If you look at the opinion on page of the record, it's page ER-011 and page 10 of the opinion itself. The section on scienter is actually entitled scienter and loss causation. So the judge combined them, which is unusual. You know, in the Ninth Circuit, you can collapse or incorporate the falsity in scienter analysis when both elements are based on the same facts. But it's never been done before to collapse the loss causation and scienter requirements. And I think that was the crux of the error that the court made. I mean, the judge says that scienter must be reviewed in the context of loss causation, you know, conflating him entirely. Well, yes. Well, Your Honor, the court's decision on scienter was based on the fact that the witnesses couldn't identify, didn't say that Kunz knew or that PayPal knew the exact number of customers' data that had been accessed. And they did? And right. We have no reason to believe that at this stage, that they knew the exact extent. But the point is that everything that PayPal disclosed on December 1st, they could have said on November 10th, with the exception that instead of saying 1.6 million have been potentially compromised, they would have said an undetermined number of customers have been potentially compromised. But otherwise, all of those facts in the December 1 press release were known on November 10th. And therefore. Well, the statement was certainly carefully worded. Question is whether I don't understand how you decide the scienter without the falsity, because if it's not false, then there's nothing to have scienter about. Yes, Your Honor. And the district court found it was false. The district court specifically said that, in fact, both on the first amended complaint and the second amended complaint, the court reiterated that this was a misleading statement, that the November 10th statement was misleading. I'll go to that. But I thought that since they weren't announcing positive information, what was their duty? Well, they were they were advising. So so the reason the reason they they spoke at all was because they had an obligation under the law to notify their to. Well, first, they were suspending operations. So everyone was going to wonder, why are you shutting down here? Right. And they needed to explain why. Secondly, they were going to have to notify authorities of the breach and they were going to have to ultimately notify the customers once they figured out which customers had been compromised or potentially. So they had to. They knew they had to say something, but they they soft. They soft peddled it because they did. They wanted. They didn't want it. Give out the bad news, because if they said an undetermined number of customers had been potentially compromised, the market might have reacted more strongly. And they were hoping to buy some time and find out exactly how many customers and hope that it would be a much smaller number. They were they were unsure. But but to say that to say that. Well, there's there's there's a case that's that's that's pretty well known that says something like to say to your hiking companion that there's a bump in the road ahead. Is caught is is is prudent, but it's deceit to tell your hiking companion that there's a bump in the road ahead when you know the Grand Canyon is is is just just a little bit away. So so in this case, they knew that there was not just a bump in the road. They knew it was it wasn't simply a vulnerability. They knew that a cost that customer data had been compromised. They just didn't know how many how much customer data. And and so the risk was much greater. The risk is material difference between saying there's enough of a vulnerability that we're suspending operations. And to say it affects an undetermined number of customers. Well, because if you say there's a vulnerability, but we're fixing it. They say that. Yes. And so that's that was the implication of. In fact, I think the lower lower court said that in its opinion that that that they minimized that they let investors feel as if there was not not not a serious risk from from the ball. They didn't say they were going to fix it when they were fixing it. Well, I think they were shutting it down. And the implication was that it didn't meet their standards. So they were shutting it down and they were going to bring it up to their standards. That was the implication of the press release. And here's a quote from the judge's second opinion. This disclosure could plausibly have created an impression that only a potential vulnerability and not an actual breach had been discovered in a vulnerability. Vulnerability differs considerably from a breach that actually threatens the privacy of 1.6 million users. So then he said it was in his analysis of whether you properly pled falsity. Yes, Your Honor. And then and then the judge said, notwithstanding the December announcement being corrected and not inconsistent, the November announcement could reasonably have created a false impression that had the effect of misleading investors. So if the only so once once you accept the premise that it's misleading, the only question is, did PayPal or Mr. Once specifically remembered, remembered Coons going into an office with Mr. Coons, who explained there had been a breach that they found an intruder in the network and that they were going to sever the several parts of the network to protect it. And he specifically said he specifically said that he understood this to mean that they had a serious concern that customer data was in jeopardy or already compromised. That's what and this is a senior systems administrator at Tio Networks. And a senior systems administrator certainly know what's going on with the network. Right. So that now and you know, the judge, the judge said, well, you know, why would why would people at PayPal bother to tell these folks? Well, when they're shutting down the network, when they're shutting down Tio, all these employees are going to wonder why they're not going to work the next day. They have to. They have to. I mean, it's it's it's particularly plausible that they would bring these employees in and have a meeting and say and explain to them why they're suspending operations. Right. And this is you know, this is not like one of those long year, year long accounting schemes where there's many moving parts. This is the events of a single day. Right. And it's extremely believable that they would bring the employees in and explain to them that there's been a breach. And this is why we have to suspend operation. So. Each of these each of these witnesses there. Each of these witnesses position and detail showed that they had personal knowledge that they were alive. Anyway, I'd like to just what I have left, I'd like to retain for rebuttal. OK. Kramer. Thank you, Your Honor. James Kramer for defendants and appellees. Let me start with first the theory of the complaint as set forth in the second amended complaint and is argued below is that the November 10th statement was materially misleading because there was a breach of the data of one point six million people. Not a one person, not any breach of one point six million. Mr. Rosen was asked about this extensively or argument, and he confirmed that that was a theory. And I would simply refer the court to various paragraphs of the second amended complaint, including paragraph four on E.R. 48 paragraph 30 on E.R. 53 and paragraph 35. So that's the complaints got to be static. That's the position they've taken. And to judge Burzon's point, which I'll come back to later, the fact that the theory is there was a magnitude of breach that wasn't disclosed is relevant to the falsity point. But I want to correct two things quickly before I move into the substance of my argument, which is first, contrary to what counsel said, the press release did not say that there was a potential compromise of data. Right. This is a securities fraud case. There's one statement in the November 10th press release. And it says that PayPal had discovered a security vulnerability. The words potential compromise don't appear anywhere in whatsoever, none whatsoever. And similarly, the suggestion that everything that was subsequently disclosed on December 1st was known on November 10th. The district court look carefully at that and you should as well. And that's absolutely not true. The employees don't support that in any way, shape or form. The first point was that. There was discovery of security vulnerabilities. You say that you didn't say that there was one point you were trying to make because the point I was trying to make is when Mr. But, you know, it's been breached. That's a clear case of falsity versus when you say we've got we've got some problems with our security. We have a vulnerability. You're not treading down the path of was there a breach? You're not treading down the path of did someone access the system? And, of course, the theory of the entire complaint is that the company, which was under no obligation to issue this press release, putting aside what state law obligations there might have been to contact users. There was no obligation to say anything. They took the hiring. They disclosed the fact that even though they just spent two hundred and thirty three million dollars on this acquisition, they disclosed the fact that they found a serious issue. They were shutting it down completely, not making any money from it whatsoever, that they were retaining cybersecurity experts to help them figure out what was going on. They were going to notify the authorities and they would provide an update in the future. And they were very careful to say, those of you who use the PayPal network, don't worry. Your data is secure because your system, the PayPal system, is not integrated with you. Nothing about the system, nothing about the data, no warm, comfortable words to your users to suggest everything is fine here. The fact that this is supposedly the start of a class purge and street fraud case is astonishing. This is a horrible statement. Having just spent two hundred thirty three million dollars. Now, on the falsity point, as Mr. Rosen pointed out, Judge Chen used the plausibility standard in determining if this was possibly false. We know from Judge Burzon's decision and Brody that that's not the state in an admissions case like this. Must affirmly create an impression of a state of affairs that differs in a material way from one that actually exists. There's no way you can read this November 10th press release and conclude that there was no breach, let alone under plaintiff's theory, a breach of one point six million. What you can infer is you've got a problem that's serious enough that we're shutting this down, that we're hiring experts to help us. So on the falsity point, which I appreciate, you get to review DeNovo. I think Judge Chen, by the own language of his order, he got that wrong in applying the plausibility standard. That's not the standard the Ninth Circuit follows. But I want to move to science because that's where Judge Chen didn't dismiss the case. And first, counsel made the point that, well, there's a heading in the opinion where I enter and lost causation are connected. As just Thomas points out, if you look at that opinion, there's is not a conflation of those two analyses. There is no discussion of lost causation. Instead, Judge Chen carefully went through all the former employees. He applied Zucco, the standard, and he looked at whether or not the plaintiffs had alleged the records and strong evidence of saying. Can I interrupt? Yes, Your Honor. I understand the big picture here. So if I understand what Judge Chen was saying, he was saying that you are not able to plead that the individuals in the company knew the extent of the breach when this press release went out. Yes, Your Honor. That's part of it. That's part of it. But remember, that's falsity, right? To get to say enter in a situation like this, it's not enough to know because it's a missions case. You've got to know more than the fact you have to know. You have to have a mental state that says, you know what? This press release on November 10th, it's going to mislead people to the wrong conclusion. And this is a Hollinger case, right? The decision of the Ninth Circuit, which says you either have to have intentional knowing or deliberate recklessness. And it defines deliberate recklessness as, quote, an extreme departure from the standards of ordinary care in which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it. So even if Mr. Koontz knew that there was a breach of 1.6 million people on November 10th, that's falsity. That's not enough. You've got to then have some facts pled which show he had the aha moment and said, hmm, it's pretty obvious that if we issue this press release and simply say a security vulnerability, people will be misled into believing that there was not a serious breach. Well, two questions or points. Yes, sure. One, doesn't it appear that the language was fairly carefully chosen, i.e. consciously chosen to avoid a breach? I'm sorry, to avoid what, Your Honor? Vulnerability seems like a strange word to use for a breach. So if you know that there has been a breach with regard to 1.6 million people and you've reached a vulnerability, can one infer that this was a purposely, carefully worded statement to avoid the admission that there was a breach? No, Your Honor, because breach is not the issue here. It's access to data. It's data being stolen. If you leave your door open to your house and someone walks in, you have a breach. That's not the issue. And all the former employees do is say someone walked in the house. Not one of them says that data was stolen. Right. And so what's happening here is PayPal, which, again, voluntarily is going to the market and shutting down the system, is saying, you know what, we got a problem, but we don't know the extent of it. But far from painting a rosy picture that everything is fine in TO land, they're hiring experts. They're notifying the authorities and reminding people that because TO is separate from PayPal, the PayPal data is fine. You don't have to worry. You don't have to worry. And by the way, Your Honor. The class of people who are the plaintiffs are people who purchased between the November 10th statement and the December 1st statement. Yes, Your Honor. That's the class period that's alleged, Your Honor. And remember. So there are people who somehow bought the stock despite the fact that they had closed down TIO and despite the fact that there was a vulnerability in the system. And presumably the only financial consequence of that could be some damages owed to the TO customers. That's correct, Your Honor. And real quick, first of all, there's no facts alleged at all. And none of the former employees offer any facts to suggest that anyone knew, let alone Mr. Koontz, about the extent of a data breach. None whatsoever. That's true. In fairness, there is a difference between vulnerability and breach. There is, Your Honor, but it's an admissions case. I think that's the key is whether it's a significant difference. Vulnerability in the cybersecurity world suggests that you don't know if there's been a breach. Yes. So that's, Your Honor. And that's in regards to their case. Well, I understand that. But that's false. That's false. Then, of course, the securities fraud requires not just, gee, you should have made that statement differently. Right. And remember, this is an admissions case because we didn't speak to there's no breach. But on the Scientra piece. Well, that's the question, not the answer. I mean, who says you didn't? One question. If you did, if it were only a disclosure case or an admission case, then the fact that you didn't issue a positive promotion would matter. But the question is whether when you say something's a vulnerability, you're saying it isn't a breach, i.e. you're making a misstatement and not simply an admission. And I think that's fair, Your Honor. If that was the only thing that the press release said, we have a vulnerability and that's it, I think that's a different case. Here you have a situation where you have shut down the system. You have hired experts. You're notifying the authorities, which, by the way, why would you notify the authorities that it wasn't a breach? And you're telling PayPal folks, you're safe. Your data is fine because it's not connected to Teal. So it's not like we said, hey, we've got a vulnerability, full stop. You've got to look at the statement in full context. But, Your Honor, that's all falsity. I really think the reason why we've led with Scienter is because there's zero at all. You're willing to concede that this was a false statement to the extent that it's stated that there was only a vulnerability? No, Your Honor. I think under the Brody decision, it plainly was not because it's not so obvious. The fact that we're debating it here today tells you that it's not so obvious. And particularly when you couple it with the requirement to read the entire press release. If I'm at PayPal, I'm going, gee, the data with Teal, that's really, there's a problem there. And remember, it's got to be under the standard for omissions. It's got to be so clear. So having a breach of one, putting aside the fact that that wasn't the theory in the complaint, it is not the theory, having a breach by one person doesn't get you there. But really on Scienter, why would Mr. Koontz, why would defendants commit securities fraud? They shut down the system, they didn't profit. No one sold any stock, right? There's otherwise no motive whatsoever alleged in the complaint. Literally, there's no explanation of why they did this whatsoever. And we submitted a decision to the court on June of this year, the Endologics case, which involved a very similar situation where the claim, and Mr. Rosen was the plaintiff's lawyer, the claim was that the defendants lied about achieving FDA approval, knowing that there was adverse information out there, and they would subsequently have to disclose the full story. Similar to here. Mr. Rosen's allegation is that you knew on November 10th a bunch of bad stuff. You told the market you'd get back to them, and then you disclosed it. In Endologic, the Ninth Circuit held that these allegations that don't resonate in common sense do not satisfy the PSLRA, and they don't require the panel to check the disbelief at the door. Allegations that are implausible do not create an inference of Scienter. If it is true that Mr. Koontz and the defendants were bent on committing securities fraud, they would have done what Mr. Rosen said they could have done, which is not disclose the facts on November 10th, sold their stock, a week later notified the authorities as they learned more information, and issued a statement on December 10th. There's no logical explanation for why this would happen. And I think if you go through the analysis, and we did this in the papers, of what the former employees say, there's three of them, none of them can speak at all to Mr. Koontz's state of mind, let alone that there was a breach of 1.6 million people. All they could say is that somebody had opened the door, not that data had been stolen. And putting that aside, and putting aside the so-called expert that never talked to a TIO employee, never talked to a PayPal employee, just read some public statements, if you do the Telabs analysis of what's cogent and compelling, there's no cogent and compelling in terms of scienter here, that's stronger than the instant explanation, which is the company did the best it could. I appreciate in hindsight, people might say... Well, it wouldn't do the best it could. The best it could would have been to say what it knew, which is that there had been at least one breach of the security. So there was some measure of whether it was done by a public relations person or trying to soften the message, at least. Well, all I can tell you, Judge Berzon, is when I read this press release, and I saw the efforts being taken to shut it down, I mean, the headline of the press release is, TIO network suspends operations to protect customers. And you differentiate between what's happening to the data on the PayPal system and the TIO system. I didn't read this to believe that there wasn't someone in the system. Why would you notify the authorities if that wasn't the case? But again, Your Honor, we're spending a lot of time on falsity. I appreciate that Judge Chen, applying an incorrect standard of plausibility, said this could plausibly be false. I would say under Brody, it's not affirmatively creating a misimpression. But even put that aside, there's zero on scienter. Nothing. Nothing in the complaint. I went back and read it earlier today again. There's not one paragraph that offers a cogent and compelling theory of why the defendants would lie. This is a securities fraud case, not a negligence case. And there's nothing in the complaint. And under the PSL array, as we know, scienter is designed specifically to halt cases that without merit, because of the significant costs and burden these impose. So it's fine to say, gee, we would have liked to see that differently. But that's not the complaint he filed. He didn't bring a claim for negligence. He didn't bring a claim for breach of fiduciary duty. It's securities fraud, subject to the pleading requirements of the private securities litigation reform act. And he needs to plead scienter with particularity. And there is zero there, Your Honor. I see I'm over time. But thank you for your time. We'll hear a rebuttal. May I please just make two short points? There's a Ninth Circuit case called SEC versus platform wireless, 617F1072 Act 1094, 2010. That case was about a company that put out a press release that gave investors the misimpression that they had a product, that was ready to ship, that they had completed development of an important new product that was ready to ship for customers, when in truth it was still in the design stages and had not yet been tested. It's still in the design stage. And so the court found that that was misleading to say that it was completed or to give people the impression it was completed, but it was really not. It was still in the design stage. And as to scienter, the court said, if no reasonable person could deny that the statement was materially misleading, a defendant with knowledge of the relevant facts cannot manufacture a genuine issue of material fact merely by denying or intentionally disregarding what any reasonable person would have known. Now, that was summary judgment. But it applies equally here where Mr. Coons, where counsel suggests that Mr. Coons just wouldn't appreciate the risk of misleading investors by saying something was only a vulnerability rather than an actual breach of customer data. What would this have accomplished? If they knew these things, from their point of view? And moreover, I mean, the part of your case that I find very puzzling is, why would anybody invest in this company at that point, knowing that they had just bought a company for $300 million and then had to shut it down because it had even looked at most charitably poor security and was reporting them to the authorities and then saying we thought everything was OK? Well, Your Honor, they actually didn't say that they were going to. The November 10th release does not say that they were reporting it to the authorities. They reported to the authorities because there's regulations that require it. But they didn't disclose that publicly to investors on November 10th. But they said shutting it down, didn't they? Yes, yes, they did. Now, the motive, so of course we don't have to plead a motive, but the motive would be it's very common for people to try to buy a little time so that they can minimize the negative or adverse effects of bad news. I mean, people, corporations do it. People do it with their family members because they don't want to disappoint. People want to minimize the damage. They want to minimize the adverse effects of the bad news. And we cited an economics article that studied this phenomenon, how companies try to issue press releases to give a soft landing to bad news. But if that's what's going on here, you ought to be able to allege scienter much more specifically than you have. Well, I think that we do allege three people say that they were told on that day that they were shutting down because of a breach that an intruder was in the system. One specifically names Kunz as having told them that. And two of them say that they understood that the customer information was in jeopardy because it had been accessed. So in those circumstances, they were clearly aware that the situation was far worse than just the vulnerability. But at the end of the day, they shut down the company. Yeah. It's a little bit different than a soft landing. It's an upgrade. At the end of the day, they shut down the company. But still, at the end of the day, there were investors who purchased in that three-week period who purchased at a price higher than they otherwise would have had they issued that December 1st press release on November 10th. Now, as I mentioned earlier, everything in that, if you look, it's paragraph 42, page 11 of our complaint, page ER-057 of the record. Everything in that press release of December 1st could have been issued and stated on November 10th. With the exception of 1.6 million customers. Substitute undetermined number of customers for 1.6 million customers. And you might have had a greater stock drop. Very well might have had a greater stock drop because it's two investors. It's the risk that counts. It's the unknown risk that investors are trying to quantify and trade on. So they actually, by buying that three weeks, the strategy worked. They were able to contain it with precise number of only 1.6 million rather than 16 million. Okay. You're five minutes over your time. Our questions took you over, too, so we're not faulting you. But I think we need, in fairness, we have to bring it to a close. Thank you both for your arguments today. I've been very helpful to the court. And this case will be submitted for decision. And we will be in recess. Thank you, Your Honors. Thank you both.
judges: Schroeder, Thomas, Berzon